STATE OF IOWA ex rel. W. L. BIERRING, Commissioner of Public Health, Appellant, v. J. A. ROBINSON, Appellee.

No. 46687.

JUNE 19, 1945.

REHEARING DENIED SEPTEMBER 22, 1945.

John M. Rankin, Attorney General, Robert L. Larson, Assistant Attorney General, and Margaret Karr, Acting County Attorney, for appellant.

Carleton Sias, of Waterloo, and F. J. Lund, of Webster City, for appellee.

MULRONEY, J.—■ Plaintiff's petition charged the defendant with engaging in the practice of medicine without a license. The answer admitted that defendant had no license but averred that he had "committed no act * * * requiring any license under any valid statute in Iowa."

Section 2439, Code of 1939, provides that no person shall engage in the practice of medicine and surgery without a license, and section 2538 defines persons who shall be deemed to be engaged in the practice of medicine and surgery as:

"1. Persons who publicly profess to be physicians or surgeons or who publicly profess to assume the duties incident to the practice of medicine or surgery. 2. Persons who prescribe, or prescribe and furnish medicine for human ailments or treat the same by surgery."

Section 2528 provides:

"The opening of an office or place of business for the practice of any profession for which a license is required by this title, the announcing to the public in any way the intention to practice any such profession, the use of any professional degree or designation, or of any sign, card, circular, device, or advertisement, as a practitioner of any such profession, or as a person skilled in the same, shall be prima facie evidence of engaging in the practice of such profession."

The following is a copy of a card which defendant had printed in 1931 and which he stated he handed around to a few friends and had them pass around to their friends:

"BE HEALED BY THE POWER OF THOUGHT

Thought is an atom, thought is a wave. Thought is energy, directed by the Will Power. Thought is Radio active. Thought reins supreme over all other atoms. Therefore you can put the poison atoms out of your system by the power of thought, leaving the pure atoms to build up the body to a healthy condition, but you must be tuned in on the blood, and grounded on the subject of which you are working.

I discovered this method of healing in June, 1928, and have had wonderful results with it and proved to my satisfaction that I am not mistaken 80% get results, 50% come back to a normal condition. Goiter, mastoids, fevers of most all kinds and some forms of rheumatism disappear like magic and many other complaints and pains disappear instantly.

J. A. Robinson
802 Bell Avenue—Webster City, Iowa
Phone 528 M."

The defendant's method of treatment was described by witnesses who had called upon him as follows:

"He used his hands and went over my head and down my spine and at the same time he was giving me an examination— I suppose it was a treatment. He had me remove most of my clothing and had me lie down. * * * Well, it wasn't just but his finger tips and a little rubbing along with it. * * * I have taken chiropractic treatments. It was some similar to it. * * * This touch with the hands or fingers is merely a light touch unless you have some tender spot, and it feels like there is some pressure then but otherwise it just feels like a real light touch."

So far as can be gleaned from the testimony, the treatment seemed to be the same for all patients, irrespective of their ailments. The treatments administered to the E. I. Leighton family of Fort Dodge consisted of treatments for Mr. Leighton's injured legs, Mrs. Leighton's illness, which defendant described as "right on the verge of a stroke," and son Lucius Leighton's throat, where the once removed tonsils had grown back "next to the jugular vein." Mr. E. I. Leighton, who witnessed the treatment administered to his wife, stated:

"The treatment consisted of manipulation of the hands and it was not like an osteopathic treatment or a chiropractic treatment as I have taken both of them. I would say the fingers were the parts of his hand that touched the person's head or neck—just the finger tips. It is a light touch." ·

He also witnessed his son's treatments and on the witness stand, under repeated questions by the assistant attorney general and the court, he was either unable or unwilling to relate how the treatment administered to his wife differed from that administered to him or to his son.

Another witness, Ernest Williamson, related that the treatment he received to cure his nervousness and headaches and the treatment administered to his infant son, who had suffered a birth injury, were "about the same."

Defendant treated the people who called upon him in his own home. He did not have any other place of business, but there was testimony that he had a card in the window of his home indicating office hours. The defendant was a blacksmith for twenty-three years. He had never attended college or medical school, nor had he received any instruction in medicine or surgery. He moved to Webster City from Woolstock in 1930 or 1931. He testified that his power to heal comes "From the silent, invisible God," and that it came to him about 1931, when he first had the cards printed and distributed. By the time of the trial he had abandoned blacksmithing and did no work except healing and a little gardening. He did not go to see or treat any people away from his home but he testified that at the time of the trial he would treat an average of twenty-five persons a day in his home. The testimony with respect to payment would show that the defendant usually received $1.25 a treatment or $5 for a series of five treatments. Of course, the witnesses for the State and for defendant were in the main friendly to the defendant, and while they would not testify that he "charged" them for the treatments, they said that he told them that the above amounts were what people usually paid him. Defendant also testified that these were the established prices but that they were established by the people that came to him and he did give some free treatments.

Upon this record the trial court denied the injunction. We think the injunction should have been granted. The case is almost indistinguishable from State v. Hughey, 208 Iowa 842, 846, 226 N. W. 371, 373. In the Hughey case the defendant maintained an office but in the instant case the defendant used his home as his office. In both cases the treatment consisted of "laying on the hands" and both defendants circulated cards wherein they professed to be healers. We held the evidence sufficient in the Hughey case to warrant a conviction of practicing medicine without a license. There we said:

"The term 'practice of medicine' is defined by Section 2538. It is not confined to the administering of drugs. Under this statute, one who publicly professes to be a physician and induces others to seek his aid as such is practicing medicine. Nor is it requisite that he shall profess in terms to be a *physician*. It is enough, under the statute, if he publicly profess to assume the duties incident to the practice of medicine. What are 'duties incident to the practice of medicine?' Manifestly, the first duty of a physician to his patient is to diagnose his ailment. Manifestly, also, a duty follows to prescribe the proper treatment therefor. If, therefore, one publicly profess to be able to diagnose human ailments, and to prescribe proper treatment therefor, then he is engaged in the practice of medicine, within the definition of Section 2538. It is quite apparent from the record that the State's witnesses had confidence in the defendant, and were friendly to him, though they were used as witnesses against him. The very confidence which he thus engendered in his patrons is a part of the fraud and imposition against which the statute seeks to protect gullible innocence. Gullibility could hardly be described in fewer words or illustrated more picturesquely than it is done by the testimony of the witness Warren:

"'He told me I had heart trouble, liver trouble, stomach trouble, gall bladder trouble, tumor. He just laid his hands on me; the tumor left. Flushed away.'

"Whether, therefore, the defendant was engaged in practicing medicine may be evidenced by 'other and different treatment' than the 'giving of medicine.'"

Further points of similarity between the two cases can also be found in the testimony of the witnesses in the instant case, who testified the defendant helped them or cured them from diseases such as neuritis, headaches, birth injuries, paralysis, glandular trouble, colitis, and goiter. Evidence of gullibility that ranks with the flushed-away tumor in the Hughey case is also to be found in this record. E. I. Leighton testified, with respect to the treatment for his son Lucius, who, it will be recalled, had the tonsils that grew back in next to his jugular vein:

"I talked with every doctor in Fort Dodge and every one of them refused to operate. They told him he would bleed to death * * * My son is fleshy and his throat is rather large. He weighs about 185 pounds and he had difficulty every morning clearing his throat. He took one treatment from Doc—from Mr. Robinson and felt relieved decidedly. He said it felt like he had a couple of golf balls in his throat and had coughed them up. He took the second treatment and those tonsils disappeared without any operation of any kind, or without any assistance from any other doctor."

Another case much similar on the facts is State v. Yates, 145 Iowa 332, 124 N. W. 174, where we held testimony that defendant told people that he rubbed them and cured them and that he was actually treating people, though he did not use medicine or surgical instruments, would be sufficient to sustain a conviction for publicly professing to practice medicine. See, also, State v. Heath, 125 Iowa 585, 101 N. W. 429, and State v. Hueser, 205 Iowa 132, 215 N. W. 643.

Defendant relies upon State v. Miller, 216 Iowa 806, 249 N. W. 141. It cannot be denied that the two cases are quite similar on the facts. In both cases the treatment was the laying on of hands. In each case the home of the defendant was used as the place for treatment. Miller testified he got his power from the Savior and he made no charge but accepted voluntary offerings of about $2 a treatment. Miller had no card but at one time he had in the telephone book before his name the letters "Dr." On this record we denied the state an injunction in the Miller case.

We make no effort to point out the two or three minor dif-

758

ferences in the fact situations in the two cases. The opinion in the Miller case seems to conflict with State v. Hughey, supra, and other decisions of this court wherein we have considered much similar evidence as sufficient to constitute engaging in the practice of medicine. Insofar as State v. Miller, supra, appears to conflict with the case of State v. Hughey, supra, we overrule the Miller opinion.

█ There is no force in defendant's argument that plaintiff failed to prove that the State Department of Health formally requested that the injunction proceedings be instituted. The action seems to be brought upon relation of W. L. Bierring, Commissioner of Public Health. Certainly, under Rule 98, Rules of Civil Procedure, the authority to bring the suit would be a permissible conclusion in the absence of any averment of facts showing no authority to bring suit.

The decision of the trial court is reversed and the cause remanded for judgment for plaintiff.—Reversed and remanded.

All JUSTICES concur.